415 U.S. 352
 94 S.Ct. 1155
 39 L.Ed.2d 370
 NATIONAL CABLE TELEVISION ASSOCIATION, INC., Petitioner,
v.
UNITED STATES and Federal Communications Commission. FEDERAL POWER COMMISSION, Petitioner, v. NEW ENGLAND POWER COMPANY et al.
 Nos. 72—948, 72—1162.
 Supreme Court of the United States
 Argued Dec. 3, 1973.
 March 4, 1974
 
 Mr. Justice MARSHALL, with whom Mr. Justice BRENNAN joins, concurring in the result in No. 72—1162 and dissenting in No. 72 948.
 
 
 1
 These cases present two distinct issues involving interpretation of the Independent Offices Appropriation Act, 1952: first, whether sufficient 'work, service, . . . benefit, . . . or similar thing of value or utility' was conferred on the CATV operators or utility companies to warrant imposition of a fee under the statute; and, second, whether, if a fee was justifiably imposed, the amount of the fee was determined in accordance with a proper interpretation of the statutory standard that it be 'fair and equitable taking into consideration direct and indirect cost to the Government, value to the recipient, public policy or interest served, and other pertinent facts.' 31 U.S.C. § 483a.
 
 
 2
 The Court, however, fails to recognize that these issues require independent analysis. Instead, permeating the Court's opinions on both issues is an attempt to draw metaphysical distinctions between a 'fee' and a 'tax.' I do not find this approach either helpful or appropriate; whatever the label, the questions presented in these cases involve simply whether the charges assessed by the Commissions were authorized by Congress. The Court's approach merely beclouds its analysis, producing results which seem to me inconsistent and affording guidance to the agencies in setting their fee policies which might be charitably described as uncertain.
 
 
 3
 This approach is allegedly based on the need to construe the statute narrowly to avoid constitutional difficulties. I do not believe that any serious question of the constitutionality of the Act would be presented if Congress had in fact authorized these charges. The notion that the Constitution narrowly confines the power of Congress to delegate authority to administrative agencies, which was briefly in vogue in the 1930's, has been virtually abandoned by the Court for all practical purposes,[1] at least in the absence of a delegation creating 'the danger of overbroad, unauthorized, and arbitrary application of criminal sanctions in an area of (constitutionally) protected freedoms,' United States v. Robel, 389 U.S. 258, 272, 88 S.Ct. 419, 428, 19 L.Ed.2d 508 (1967) (Brennan, J., concurring). This doctrine is surely as moribund as the substantive due process approach of the same era—for which the Court is fond of writing an obituary, e.g., Ferguson v. Skrupa, 372 U.S. 726, 83 S.Ct. 1028, 10 L.Ed.2d 93 (1963); North Dakota Pharmacy Board v. Snyder's Stores, 414 U.S. 156, 94 S.Ct. 407, 38 L.Ed.2d 379 (1973)—if not more so. It is hardly surprising that, until today's decision, the Court had not relied upon Schechter Poultry Corp. v. United States, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935), almost since the day it was decided.[2]
 
 
 4
 I have no doubt—and I suspect that a majority of the Court would agree—that Congress could constitutionally authorize the Commissions to impose annual charges of the sort involved here. Surely the congressionally presribed standards, permitting imposition of fees for work done or service or benefit provided if they are 'fair and equitable' taking into account 'cost to the Government, value to the recipient, (and) public policy,' are sufficiently definite to withstand any conceivable delegation objection. See, e.g., Yakus v. United States, 321 U.S. 414, 423 427, 64 S.Ct. 660, 88 L.Ed. 834 (1944); Lichter v. United States, 334 U.S. 742, 783—786, 68 S.Ct. 1294, 92 L.Ed. 1694 (1948). I therefore see no reason to construe the statute in an artificially narrow way to avoid nonexistent constitutional difficulties.
 
 
 5
 Even on a neutral reading of the statute and its legislative history, however, I am convinced that Congress did not intend to authorize industrywide annual assessments like those at issue here. The movement in Congress to encourage Government agencies to establish fees to recover some of the costs of providing services to special beneficiaries began in 1950 with a study of the Senate Committee on Expenditures in the Executive Branch which culminated in a report to Congress on 'Fees for Special Services.' S.Rep.No.2120, 81st Cong., 2d Sess. (1950). This report concluded that fees should be charged for agency services the benefits of which accrued wholly or primarily to special interests. Id., at 3 4. In particular, the report pointed out that the FCC 'renders a tremendous variety of services, a substantial number of which would lend themselves to equitable fees.' Id. at 4. The report listed the type of services for which assessment of fees would be appropriate: radio station construction permits, radio station operating licenses and renewals, authorization of assignment or transfer of licenses, radio operator licenses, and certificates of public convenience and necessity. Id. at 11.[3]
 
 
 6
 On the other hand, the report was careful to point out the limited nature of its recommendations. It emphasized that it was not proposing that Government regulation in general be made self-sustaining by shifting the costs to those regulated:
 
 
 7
 'There has been no quarrel with the philosophy governing the study that those who receive the benefit of services rendered by the Government especially for them should pay the costs thereof. In the several staff reports and press releases which have been issued, occasion has been taken to reiterate that philosophy and to give reassurance that there is no thought here to establish a system of fees for fundamental Government services, but only to explore the feasibility and fairness of shifting to special beneficiaries the expense now being borne for them by the taxpayers at large.' Id., at 3.
 
 
 8
 These themes were reiterated during the 1951 hearings which led directly to enactment of the Independent Offices Appropriation Act, 1952. Hearings on Independent Offices Appropriations for 1952 before the Subcommittee on Independent Offices of the House Committee on Appropriations, 82d Cong., 1st Sess. (1951). The questions of the committee members reflected their concern that the regulatory agencies were not recouping any part of the cost of services which benefited particular special interests. But it is apparent that the Committee had in mind imposition of fees for issuance of licenses, id., at 281, 681, certificates of public convenience and necessity, id., at 281, 524, and the like. And it was recognized that in the absence of this sort of special benefit, imposition of the cost of regulation on those regulated represented a different philosophical approach, as to which there had been in the past substantial resistance. Id., at 730.
 
 
 9
 The actual language of the Appropriation Act is quite general, and is certainly capable of varying interpretations. But the intended content of the statute's authorization of fees to be charged for 'any work, service publication, report, document, benefit, privilege authority, use, franchise, license, permit, certificate, registration or similar thing of value or utility' can be gleaned from this legislative history. When the Committee Report expressed its concern that 'the Government is not receiving full return from many of the services which it renders to special beneficiaries,' H.R.Rep.No.384, 82d Cong., 1st Sess., 2 (1951), and suggested that 'fees could be charged for other services' 'of the type here under consideration,' id., at 3, I think that it contemplated imposition of application fees, registration fees, and fees for grants of licenses, permits, or other similar authorizations. This interpretation is consistent with the statutory language, with its long enumeration of specific, readily identifiable, and discrete Commission actions for which fees can be charged. This interpretation is consistent, also, with the explanation of the statute on the floor of the House offered by Representative Yates, in which he cited the award of franchises, licenses, certificates of public convenience and necessity, and construction permits as examples of benefits for which fees could appropriately be charged by the FCC. 97 Cong.Rec. 4809 (1951).
 
 
 10
 I see nothing in the legislative history which suggests any broader interpretation of the concept of 'benefit' under the Act. On the contrary, since the broader view that the full cost of regulation should be assessed those subject to the agency's jurisdiction in the absence of a 'special benefit' would have represented a controversial policy choice, I think that the very lack of debate over this provision of the Act and the ease with which it passed compel the more limited interpretation. The Committee Report itself noted that more 'basic' changes in agency fee practice would have to await further study by congressional committees and additional legislation. H.R.Rep.No.384, 82d Cong., 1st Sess., 2—3 (1951).
 
 
 11
 I therefore do not believe that the creation of a 'economic climate' which fosters the growth of a regulated industry is a sufficiently specific, discrete benefit within the meaning of the Appropriation Act to justify imposition of a fee. Nor do I think that this benefit is conferred upon a sufficiently identifiable recipient to be the basis for assessment of a fee. Accordingly, I agree with the Court's construction of the Act, 415 U.S., at 349 350, 94 S.Ct., at 1154—1155, and concur in the result in this case.
 
 
 12
 I cannot agree, however, with the result in No. 72—948, National Cable Television Assn. v. United States, 415 U.S. 336, 94 S.Ct. 1146, 39 L.Ed.2d 370. In view of the Court's conclusion in No. 72—1162, I am mystified as to how the Court can reach its apparent, though completely unexplained, holding in No. 72—948 that operators of CATV systems may receive 'special benefits' sufficient to sustain imposition of an annual fee under the Appropriation Act. 315 U.S., at 343, 94 S.Ct., at 1150. In 1970, when the fees at issue here were established, FCC regulation of CATV was quite limited. CATV operators did not receive licenses or any similar authorization from the Commission. Rather, their franchises were generally awarded by state authorities, to whom the CATV operators pay franchise fees. Although FCC regulations prohibited carriage of distant signals into larger television markets unless Commission authorization was obtained, 47 CFR § 74.1107 (1968),[4] carriage of local signals as well as distant signals into smaller markets was permitted, unless objections were raised, without the need for approval by the Commission. 47 CFR § 74.1105(a), (c) (1968). Many of the CATV operators against whom these annual charges were assessed had no contact at all with the Commission during 1970, and some had never had any dealings with the Commission. The only other FCC regulations of CATV in 1970 pointed to by the Solicitor General are regulations which prohibit telephone companies and television broadcasters from entering the CATV field.[5]
 
 
 13
 In my view, the mere existence of such regulation cannot justify the annual fees imposed in this case. While these regulations may have been of some benefit to the CATV industry in a very broad sense, I regard the FCC's argument on this point as identical to the FPC's 'economic climate' argument rejected by the Court in No. 72—1162. I can see no specific benefit provided or service rendered by the Commission on the order of the grant of a license or certificate, processing of an application, or even provision of a new and useful accounting system. Nor do I believe that the benefits of FCC regulation have been conferred on any identifiable recipient; I would think this a classic case where "the identification of the ultimate beneficiary is obscure and the services can be primarily considered as benefitting broadly the general public." 315 U.S., at 350, 94 S.Ct., at 1154.
 
 
 14
 I would therefore hold that the annual fees imposed in both these cases were not authorized by the statute. But since the Court apparently holds otherwise, and goes on to discuss the standards to be applied by the FCC in setting fees under the statute, I think it appropriate to express my views on this issue. I cannot agree with the Court that the only factor which the Commission may consider in determining the amount of the fees is the 'value to the recipient.' The statute provides that the fee must be 'fair and equitable taking into consideration direct and indirect cost to the Government, value to the recipient, public policy or interest served, and other pertinent facts.' This is a perfectly clear and intelligible standard, and I see no reason why, assuming a proper occasion for imposition of a fee, the Commission is not entitled to weigh each of the statutory considerations. It may well be true that the Commission here gave undue emphasis to one of the statutory factors, 'cost to the Government.' But the Court's response, to require that undue, seemingly exclusive reliance be placed on the standard of 'value to the recipient' is, in my opinion, equally erroneous. It is also quite unrealistic and unworkable: How is the Commission to determine whether to set the fee at 1%, 5%, or 50% of the 'value to the recipient' unless it is also free to consider such other factors as 'cost to the Government' and 'public policy'?
 
 
 15
 I would leave the Commission free to consider all the statutory standards in setting its fees. Certainly the Commission should be free to consider 'cost to the Government,'[6] as well as the statutory mandate that the Commission 'be self-sustaining to the full extent possible.' It could not be clearer, from the language of the statute and from its genesis, that Congress intended these factors to be considered by the Commissions in setting their fee schedules. If the Court seriously believes that this somehow presents a substantial constitutional problem, then the constitutional issue should be squarely faced and resolved; it should not be permitted to justify the Court's rewriting of the statute contrary to congressional intent.
 
 
 16
 I would affirm the judgment of the Court of Appeals in No. 72 1162 and reverse the judgment in No. 72—948.
 
 
 
 [1]
 'Lawyers who try to win cases by arguing that congressional delegations are unconstitutional almost invariably do more harm than good to their clients' interests. Unrealistic verbiage in some of the older judicial opinions should not now be taken seriously. The effective law is in accord with a 1940 statement of the Supreme Court: 'Delegation by Congress has long been recognized as necessary in order that the exertion of legislative power does not become a futility.' (Sunshine Anthracite Coal Co. v. Adkins, 310 U.S. 381, 398, (60 S.Ct. 907, 84 L.Ed. 1263) (1940).) Much of the judicial talk about requirement of standards is contrary to the action the Supreme Court takes when delegations are made without standards. The vaguest of standards are held adequate, and various delegations without standards have been upheld. . . .
 'In only two cases in all American history have congressional delegations to public authorities been held invalid. Neither delegation was to a regularly constituted administrative agency which followed an established procedure designed to afford the customary safeguards to affected parties. The Panama case (Panama Refining Co. v. Ryan, 293 U.S. 388 (55 S.Ct. 241, 79 L.Ed. 446) (1935)) was influenced by exceptional executive disorganization and in absence of such a special factor would not be followed today. The Schechter case (Schechter Poultry Corp. v. United States, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935)) involved excessive delegation of the kind that Congress is not likely again to make. . . .
 'In absence of palpable abuse or true congressional abdication, the non-delegation doctrine to which the Supreme Court has in the past often paid lip service is without practical force.' 1 K. Davis, Administrative Law Treatise § 2.01 (1958) (footnotes omitted).
 
 
 [2]
 The last time that the Court relied upon Schechter Poultry was in Carter v. Carter Coal Co., 298 U.S. 238, 56 S.Ct. 855, 80 L.Ed. 1160 (1936).
 
 
 [3]
 Similarly, as to the Federal Power Commission, the report suggested that fees could be charged for issuance of licenses and certificates of public convenience. Id., at 12.
 
 
 [4]
 It would seem clear that fees could appropriately be imposed under the Appropriation Act in connection with application for or issuance of such Commission authorization. However, no such fees are at issue in this case.
 
 
 [5]
 Extensive new regulations of CATV were promulgated in 1972. 37 Fed.Reg. 3280 (Feb. 12, 1972). These regulations prescribe in considerable detail the provisions of franchises granted by local authorities to CATV operators, and also limit the franchise fees which may be charged by the localities in whch CATV stations operate. Most important for present purposes, the new regulations also provide that a CATV operator must obtain an FCC certificate of compliance before commencing operations; existing cable systems must obtain a certificate of compliance by March 31, 1977. 47 CFR § 76.11(b) (1973). While these new regulations will undoubtedly affect the question of the permissibility of fees imposed for future years, they cannot retroactively validate fees imposed for 1970.
 
 
 [6]
 In my view, 'cost to the Government' comprehends the cost of FCC regulation of the industry as well as the cost of processing a specific application. While the existence of such regulation is not itself sufficient under the present statute to sustain imposition of a fee, it will often be beneficial to the industry—as the Government's 'economic climate' argument suggests and will play a role in enhancing the 'value to the recipient' of the license or other authorization. It is therefore neither unreasonable nor inconsistent with the statutory intent that the contribution of this regulation be considered.